## STATE EX REL. HYNDS v. CAHILL, COUNTY CLERK, ET AL.

ANTI-GAMBLING STATUTE, VALIDITY OF — RESERVED QUESTIONS — CONSTITUTIONAL LAW—STATUTES, ENACTMENT OF—SIGNING BY PRESIDING OFFICER—ENROLLED ACT—PRESUMPTIONS—LEGISLATIVE JOURNALS AS EVIDENCE TO IMPEACH ENROLLED ACT—ENTRIES IN LEGISLATIVE JOURNALS, CONSTRUCTION OF—EVIDENCE.

1. Important and difficult questions arising in a cause duly reserved and docketed prior to the amendatory act of 1903 limiting reserved questions to such as are constitutional in

character are properly before the court whether the reservation embraces constitutional questions or not; but in this case the questions are constitutional in character and their reservation is authorized by the said amendatory act.

2. Where an enrolled act of the Legislature bearing the signature of the presiding officer of each house, and of the Governor approving the same, is deposited in the office of the Secretary of State, and published among the other laws of the session as one of the duly passed and approved laws of the State, the presumption is that the act was regularly passed.

3. An enrolled act in the office of the Secretary of State, bearing the signature of the presiding officer of each house, and the signature of the Governor approving the same, is to be taken as prima facie evidence that the act was duly and regularly passed pursuant to the constitutional requirements, and duly and properly authenticated and approved.

4. Where an entry in a legislative journal shows the signing of a bill by the presiding officer, the presumption is that the signing occurred in the presence of the house over which such officer presided.

5. In determining whether a statute has been constitutionally enacted, the legislative journals are competent evidence to be consulted by the courts, concerning any procedure prescribed by the constitution for the passage of laws, which the constitution also expressly declares shall be made a matter of journal record.

6. An affirmative showing by the legislative journals, in reference to any procedure prescribed by the constitution to be entered on the journal, that a bill was not passed in a constitutional manner, is competent to overthrow the presumption of regularity arising from the enrolled act.

7. Whether the constitutional provision (Art. 3, Sec. 28) requiring the fact of signing a bill by the presiding officer to be entered on the journal is mandatory or not is discussed, but a decision of that question being unnecessary to a determination of the pending controversy, it is assumed, without deciding it, that the provision is mandatory.

8. The constitution requiring the presiding officer of each house, in the presence of the house over which he presides, to sign all bills and joint resolutions passed by the Legislature immediately after their titles have been publicly read, and that the fact of signing shall be at once entered on the journal; *Held,* that a journal entry pursuant to such re-

quirement will be sufficient which amounts to a substantial compliance therewith.

9. In construing and determining the sufficiency of a legislative journal entry intended to show the signing of a bill by the presiding officer, the presumption of regularity arising from the enrolled act and the signatures thereto attached is not to be disregarded.

10. The presiding officer of each house having signed, and the Governor having approved, an enrolled act deposited in the office of the Secretary of State, the presumption follows, until overthrown by competent evidence, that it was signed by the presiding officers as required by the constitution, and that the required formalities accompanied such signing.

11. Where throughout the journal of the House enrolled acts of the Senate and House were designated respectively by initials, as "S. E. A." and "H. E. A.," and following the caption, "Signing of Bills," an entry stated that "The Honorable Speaker announced that he was about to sign the following 'H. E. A.'s,'" and then described by number, title, and number of original bill, several House enrolled acts, and continued without further explanation to describe several Senate enrolled acts, concluding with a description of a certain S. E. A. by number, title, and number of original bill; *Held,* that the entry is to be construed as showing an announcement that the Speaker was about to sign the several Senate enrolled acts mentioned, there being nothing elsewhere in the journal to disturb such construction.

12. Owing to the conditions under which legislative journals are usually prepared, they ought not to be construed technically, but should be sustained as sufficient whenever it is possible to reasonably so construe them.

13. A technical construction should not be applied to a legislative journal entry evidently intended as a compliance with the constitutional requirement that the fact of signing a bill by the presiding officer shall be entered on the journal.

14. A legislative journal entry intended to show that the Speaker of the House signed a bill as required by the constitution should be examined, and its sufficiency determined in the light of surrounding circumstances; and the admitted fact that the Speaker actually signed the bill is not to be discarded in determining the sufficiency of the entry.

15. In construing the meaning and effect of words employed in a legislative journal entry, the subject matter and the connection in which the words are found should be considered.

16. The signature of the Speaker attached to the enrolled act is the best evidence of the mere fact of signing. The journal entry of the fact of signing is required for the purpose of making a record of the time and place of the signing to show that it occurred in compliance with the constitution.

17. An entry in the House journal under the caption, "Signing of Bills," stating that the Speaker announced that he was "about to sign the following H. E. A.'s," and then immediately describing several House enrolled acts and Senate enrolled acts, and it appearing by the journals of the two houses that the bills described had duly passed both bodies, and were then enrolled and ready for signature; *Held,* that the entry is to be construed as denoting that the Speaker was at that time engaged in the act of signing the several bills therein described, and to amount to a substantial compliance with the constitutional requirement that the fact of signing be at once entered on the journal.

18. Held proper in the interpretation of an entry in a legislative journal to consider its caption, "Signing of Bills," as explanatory of the entry, and tending to unfold the meaning of the words that follow, or the sense in which they were employed.

19. A statute should not be held void as in conflict with the constitution unless a clear violation of that instrument is shown. If there is any doubt, it is to be resolved in favor of the law.

20. Every reasonable presumption favorable to the validity of an act will be given to entries in legislative journals.

21. Chapter 65, Laws of 1901, relating to gaming is a valid and constitutionally enacted statute of the State.

22. Sections 2151, 2152, 2179, 2181, 2182 and 2185, Revised Statutes of 1899, are not in force, because repealed by Chapter 65, Laws 1901.

[Decided February 18, 1904.]                (75 Pac., 433.)

RESERVED questions from the District Court, Laramie County, HON. RICHARD H. SCOTT, Judge.

The material facts, and the questions reserved for the decision of the court, are stated in the opinion.

*Charles W. Burdick,* for the relator.

It is competent and is the duty of courts to consult legislative journals in reference to matter which the constitution

expressly requires to be recorded therein, concerning the procedure prescribed by the constitution for the passage of an act, and the journals may be used to impeach the enrolled act. (Brown v. Nash, 1 Wyo., 85; State v. Swan, 7 Wyo., 166.) The journals imply verity; and are the bound volumes deposited with the Secretary of State and cannot be impeached either by parol evidence, entry of later date, or the minutes or memoranda sheets kept by the legislative clerk. (23 Ency. of Law, 193; Black's Const. Law, 60, 225; State v. Buckley, 54 Ala., 613; Montgomery B. B. Works v. Gastin, 126 Ala., 425; State v. Smith, 44 O. St., 348; Ex parte Iron Co., 119 Ala., 484; State v. Abbott, 59 Neb., 106; Webster v. Hastings, 59 Neb., 563; Commissioners v. Snuggs, 121 N. C., 394; Koehler v. Hill, 60 Ia., 560; Hughes v. Felton, 11 Colo., 489; Div. of Howard Co., 15 Kan., 194; In re Granger, 56 Neb., 260; Cohn v. Kingsley, 38 L. R. A., 74; Auditor Gen'l v. Board, 89 Mich., 593; Attorney General v. Rice, 64 Mich., 385; Sackrider v. Supervisors, 79 Mich., 59; R. Co. v. Hughes, 38 Ill., 186; Shappel v. Brethauer, 70 Ill., 166; McCullough v. State, 11 Ind., 427; Wise v. Bigger, 79 Va., 269; State v. Moffatt, 5 O., 359; Fordyce v. Godman, 20 O. St., 1; State v. Francis, 26 Kan., 724; Commissioners v. De Rossett, 129 N. C., 275; State v. Mason, 43 La. Ann., 776; Burkhart v. Reed, 2 Ida., 470; White v. Hinton, 3 Wyo., 754.)

Upon authority I consider all constitutional requirements mandatory, but subject to classification into three grades or degrees: (a) Those containing express words of prohibition, such as: "No bill shall become a law except by vote of a majority of the members elected to each house," etc. (Art. 3, Sec. 25, Const. of Wyo.) (b) Those not containing prohibitory words, but containing words of imperative and exclusive significance, such as: "And the fact of signing shall be *at once* entered upon the journal," (Art. 3, Sec. 28), and "The enacting clause of *every* bill shall be as follows," etc. (Art. 3, Sec. 21). (c) Those containing neither words of prohibition nor words of exclusive sig-

nificance, but simply containing the positive mandate *shall* and sometimes coupled with provisional or optional performance, but none the less mandatory, such as: "Each house shall keep a journal" (Art. 3, Sec. 13), and "The sessions of each house shall be open *unless* the business is such as requires secrecy" (Art. 3, Sec. 14), and "Neither house shall, *without* the consent of the other, adjourn," etc. (Art. 3, Sec. 15).

Of the requirements under consideration, Section 23, Article 3, comes within the first and Section 28, Article 3, within the second classification.

Without exception the courts and text writers have considered such requirements as those within the first classification mandatory.

As to those of the second and third classifications, all the text writers and a great majority of courts so regard them.

While the classification above made is arbitrary, still it appears reasonable and in harmony with the language used, and if a provision of the third grade is mandatory, surely those of the second containing more imperative words must be regarded in the same light.

Upon authority, however, *all* requirements are mandatory, and in this view the text writers without exception agree. (Potter's Dwarris Statutes, 665; Endlich Int. Stat., 433; Story on Const., 426; Black's Const. Law, 70; Suth. on Stat. Const., 41; Cooley Con. Lim., 93, 168, 179, 180.)

Among the courts of the several states there is not the same unanimity as among text writers, and the courts of a few states have undertaken to declare some constitutional requirements directory, but the decisions to this effect in these states are not supported by authority, have not been generally followed by other states, and in some cases, if not directly, are at least inferentially disapproved by later cases in the particular states where rendered, while on the other hand the highest courts of no less than twenty-seven states have declared that all constitutional requirements are mandatory and must be literally complied with by the Legisla-

ture in the enactment of laws. To this effect are the following cases:

Ala.—Bridge Co. v. Olmstead, 41 Ala., 9; Weaver v. Lapsley, 43 Ala., 229; State v. Buckley, 54 Ala., 599; Moog v. Randolph, 77 Ala., 597; O'Hara v. State, 121 Ala., 28.

Ark.—Vincent v. Knox, 27 Ark., 266; Smithee v. Garth, 33 Ark., 17.

Cal.—Railroad Tax Cases, 8 Sawy., 238; Paving Co. v. Hilton, 69 Cal., 479.

Colo.—In re House Bill, 26 Colo., 234.

Fla.—In re Advisory Opinion, 31 So., 348.

Ga.—Protho v. Orr, 12 Ga., 36; Harper v. Elberton, 23 Ga., 566.

Id.—Cohn v. Kingsley, 38 L. R. A., 74; Brown v. Collister, 51 Pac., 417.

Ill.—People v. Campbell, 3 Gilm., 466; Spangler v. Jacoby, 14 Ill., 297; Turley v. Logan, 17 Ill., 151; People v. Starne, 35 Ill., 121; R. Co. v. Hughes, 38 Ill., 174; People v. DeWolfe, 62 Ill., 253; Ryan v. Lynch, 68 Ill., 161; People v. Commissioners, 120 Ill., 322.

Ind.—Commissioners v. Baker, 88 Ind., 374; May v. Rice, 91 Ind., 546.

Iowa—Koehler v. Hill, 60 Ia., 543.

Ky.—Varney v. Justice, 86 Ky., 596; Norman v. Board, 93 Ky., 537.

La.—Walker v. Colwell, 4 La. Ann., 297.

Minn.—Board v. Heenan, 2 Minn., 330; Lincoln v. Haugen, 45 Minn., 451; Sjoberg v. Loan Assn., 73 Minn., 203.

Mich.—Steckert v. City, 22 Mich., 104; Sackrider v. Supervisors, 79 Mich., 59; Attorney General v. R. R. Co., 97 Mich., 589; People v. Dettenthaler, 77 N. W., 450; Fillmore v. VanHorn, 88 N. W., 69.

Mo.—State v. Miller, 45 Mo., 496.

Mont.—State v. Tooker, 15 Mont., 8; Durfee v. Harper, 22 Mont., 354.

Nev.—State v. Rogers, 10 Nev., 250; State v. Tufley, 19 Nev., 391; State v. Howell, 64 Pac., 466.

N. Y.—Thomas v. Dakin, 22 Wend., 9; Purdy v. People, 4 Hill, 382; Debow v. People, 1 Denio, 9; People v. Lawrence, 36 Barb., 177; People v. Hills, 35 N. Y., 449; Bank v. Sparrow, 2 Denio, 97; People v. Allen, 44 N. Y., 379; People v. Commissioners, 54 N. Y., 276; Rumsey v. R. R. Co., 130 N. Y., 88.

N. C.—Trustees v. McIver, 72 N. C., 76; Scarborough v. Robinson, 81 N. C., 409; State v. Patterson, 98 N. C., 660; Bank v. Commissioners, 119 N. C., 214; Board v. Smuggs, 121 N. C., 394; Rodman v. Town, 122 N. C., 39; Coler v. Board, 89 Fed., 257; Board v. Call, 123 N. C., 311; McGuire v. Williams, 123 N. C., 349; Smathers v. Commissioners, 125 N. C., 480; Glenn v. Ray, 126 N. C., 730; Debnam v. Chitty, 43 S. E., 3; Black v. Commissioners, 129 N. C., 121; Commissioners v. De Rossett, 129 N. C., 275.

Neb.—Smailes v. White, 4 Neb., 356; Howell v. State, 4 Neb., 503; Ryan v. State, 5 Neb., 276; Sovereign v. State, 7 Neb., 407; Lancaster v. Hoagland, 8 Neb., 38; South Omaha v. League, 42 Neb., 671; State v. Cobb, 44 Neb., 434; State v. Tibbetts, 53 Neb., 228; Webster v. Hastings, 59 Neb., 563; R. R. Co. v. Smythe, 103 Fed., 376; State v. R. R. Co., 60 Neb., 741; Simpson v. U. S. Y. Co., 110 Fed., 799.

Ore.—Currie v. So. Pac. Co., 21 Ore., 566.

S. C.—State v. Platt, 2 S. C., 150; Bond Debt Cases, 12 S. C., 200; State v. Haygood, 13 S. C., 46.

Tenn.—Cannon v. Mathes, 8 Heisk., 504; Brewer v. Mayor, 86 Tenn., 732; State v. Algood, 87 Tenn., 163.

Tex.—Cannon v. Hemphill, 7 Tex., 208; City v. Gould, 34 Tex., 49; Cox v. State, 8 Tex., 254; Holly v. State, 14 Tex. App., 505; Hunt v. State, 22 Tex. App., 396.

U. S.—South Ottawa v. Perkins, 94 U. S., 260; Post v. Supervisors, 105 U. S., 667.

Utah—Richie v. Richards, 14 Utah, 345.

Wash.—State v. Superior Court, 68 Pac., 957.

Wis.—Dirkey v. Janesville, 26 Wis., 697; McDonald v. State, 80 Wis.,.407.

The foregoing certainly indicates an overwhelming weight of authority to the effect that all constitutional requirements are mandatory, but it has been suggested, and that view will doubtless be presented for the consideration of this court, that constitutional requirements are merely directory unless preceded by words of prohibition. To this effect are a few cases in which a distinction is drawn between those requirements preceded by express words of prohibition and those lacking such words, viz: People v. Supervisors, 8 N. Y., 317; State v. Mead, 71 Mo., 266; In re Roberts, 5 Colo., 525.

A very few cases attempt a distinction between that class of requirements relating to matters of procedure and the exercise of legislative power or authority, but this distinction has not been approved generally and is not supported by reason or authority; on the other hand, many jurists have held that constitutional requirements prescribing a journal entry in relation to legislative procedure attain the grade and dignity of legislative power for the reason that from compliance with them and in that manner only can the courts or the people determine whether the constitution has been obeyed.  (Miller v. State, 3 O. St., 476; Hominghausen v. Knoche, 58 Kan., 64; State v. Long, 21 Mont., 26.)

The process of legislation does not cease until the enrolled act has finally received the approval of the executive or has been passed over his veto, or has become a law by virtue of the expiration of the time limited for its return to the Legislature.  (Jones v. Hutchinson, 43 Ala., 71; Logan v. State, 3 Heisk., 442; Hall v. Miller, 4 Neb., 503; Memphis v. United States, 97 U. S., 293; Endlich Int. of Stat., 543; Fowler v. Pierce, 2 Cal., 165; Warten v. Philadelphia, 33 Pa., 202.)

The prevailing doctrine is undoubtedly this: That constitutional requirements are not only mandatory, but do not

undertake to prescribe mere rules of procedure, except when such rules are essential to the thing to be done, and in such case they are a limitation on the power to be exercised and must be followed to the exclusion of all other modes of procedure. (Cooley's Const. Lim. (6th Ed.), 93; Endlich Int. of Stat., 433; Collier v. Frierson, 24 Ala., 108; Jones v. Hutchinson, 43 Ala., 731; Moody v. State, 48 Ala., 115; Weil v. Kenfield, 54 Cal., 111; Paving Co. v. Hilton, 69 Cal., 479; Sjoberg v. Loan Asso., 73 Minn., 203; Berry v. R. R. Co., 41 Md., 446; Legget v. Mayor, 42 Md., 203; Scarborough v. Robinson, 81 N. C., 409; State v. Patterson, 98 N. C., 660; State v. Platt, 2 S. C., 150; Bond Debt Cases, 12 S. C., 200; Cohn v. Kingsley, 38 L. R. A., 74; Brown v. Collister, 51 Pac., 417; Spangler v. Jacoby, 14 Ill., 297; People v. Commissioners, 120 Ill., 322; Koehler v. Hill, 60 Ia., 543; Varney v. Justice, 86 Ky., 596; Cox v. State; 8 Tex. App., 254; Hunt v. State, 22 Tex. App., 396.)

*There is another prevailing rule that, although mandatory, compliance will in certain cases be presumed.*

While all constitutional requirements are mandatory, there is this distinction to be noted, that a few contain within their own phraseology a prescribed method for determining whether their mandates have been complied with, as for instance a requirement that "the names of those voting shall be entered on the journal," and out of this distinction has grown another general rule, that courts will presume legislative compliance with constitutional requirements even in the absence of a satisfactory journal record unless the requirement is one prescribing a journal record of the act to be performed, in which case the journal must affirmatively show compliance, otherwise no presumption is warranted and the presumption of validity attaching to every properly enrolled and duly authenticated act is overcome and the act will be declared void. (Cooley Const. Lim., pp. 135, 136; State v. Swan, 7 Wyo., 165; Vinsant v. Knox, 27 Ark., 266; English v. Oliver, 28 Ark., 321; Worthen v. Badgett, 32 Ark., 496; Smithee v. Garth, 33 Ark., 17; State v.

Crawford, 35 Ark., 237; Chico Co. v. Davies, 40 Ark., 200; Cohn v. Kingsley, 38 L. R. A., 74; Spangler v. Jacoby, 14 Ill., 297; Supervisors v. People, 25 Ill., 163; People v. Starne, 35 Ill., 121; R. R. Co. v. Hughes, 38 Ill., 174; People v. DeWolfe, 622 Ill., 253; Ryan v. Lynch, 68 Ill., 160; McCullough v. State, 11 Ind., 424; Hollingsworth v. Thompson, 45 La. Ann., 222; Hall v. State, 82 Ala., 562; Ex parte Iron Co., 24 So. (Ala.), 576; Montgomery B. B. Works v. Gaston, 28 So. (Ala.), 497; R. R. Tax Cases, 13 Fed., 766; Weil v. Kenfield, 54 Cal., 111; People v. Dunn, 80 Cal., 211; State v. Hocker, 18 So. (Fla.), 767; Glidwell v. Martin, 51 Ark., 559; Webster v. Little Rock, 44 Ark., 536; State v. Buckley, 54 Ala., 599; Perry Co. v. R. R. Co., 58 Ala., 546; Harrison v. Gordy, 57 Ala., 49; Clark v. Jack, 60 Ala., 271; Walker v. Griffith, 60 Ala., 361; State v. Laiche, 29 So. (La.), 700; Board v. Henan, 2 Minn., 330; State v. Hastings, 24 Minn., 78; State v. Peterson, 38 Minn., 143; Ins. Co. v. Colo. L. & T. Co., 36 Pac. (Colo.), 793; People v. McElroy, 72 Mich., 446; Jackson v. State, 31 So. (Ala.), 380; Auditor General v. Board, 99 Mich., 593; Black v. Commissioners, 39 S. E. (N. C.), 818; Hull v. Miller, 4 Neb., 503; Rodman v. Waxham, 41 S. E. (N. C.), 488; Bond Debt Cases, 12 S. C., 200; State v. Haygood, 12 S. C., 46; State v. McConnell, 3 Lea, 333; Williams v. State, 6 Lea, 549; Ottawa v. Perkins, 94 U. S., 260; Richie v. Richards, 47 Pac. (Utah), 670; McDonald v. State, 80 Wis., 407.)

The importance of the questions involved has seemed to justify the foregoing extended citation of authorities, and from those citations, representing the great weight of authority, I assert the law to be that *all* constitutional requirements are mandatory; that where a mode of legislative procedure is prescribed it must be followed, and that while courts will in ordinary cases presume the Legislature has complied with the mandatory requirements of the constitution, this presumption does not exist in cases where a journal entry is prescribed.

As to Section 23, Article III, from the journal record it appears that the bill in question was never referred to any committee save the committees of enrollment, printing and committee of the whole. Does this satisfy the requirements of Section 23, Article 3, of the constitution, which is as follows: "No bill shall be considered or become a law unless referred to a committee, returned therefrom and printed for the use of the members." Courts take judicial notice of legislative procedure and the manner in which they transact business, and therefore know that bills are *considered* in the committee of the whole, a committee made up of the entire legislative membership. Of this fact the framers of the constitution were aware and it was their evident purpose that each bill should be examined by a standing committee appointed for the express purpose of investigating bills of a particular class before they were considered by a committee of the entire body. If this was the requirement, a reference directly to the committee of the whole evades the plain command of the constitution. The recognized difference in the organization, functions and powers of the committee of the whole and the standing committees lends force to the assertion that a reference to the committee of the whole was not such a reference as was contemplated by the constitution, for standing committees are presumed to be composed of members having a special fitness for the examination and investigation of the bills referred for their examination, and such committees are limited in their inquiries to the particular subjects embraced in the bills referred to them. In this respect and also as to time of sitting, procedure and organization the committee of the whole is of different character and is not as well organized or conducted for close investigation as are sub or standing committees. (Cushing's Law and Practice of Legislative Assemblies.)

As to Section 28, Article 3, of the constitution, it is a mandatory requirement prescribing in imperative language the performance of a certain act, in a certain place, at a

prescribed time, and that a record showing compliance shall "at once" be made in the legislative journals. The Senate Journal shows compliance with this mandate and recites that the President gave notice that he was about to sign certain enrolled acts, among the number being Senate Enrolled Act No. 26, under discussion here, and then continues thus: "And thereupon Mr. President did in the presence of the Senate affix his official signature to the following entitled enrolled acts, Senate," and then follows a list of enrolled acts, including Enrolled Act No. 26. There can be no criticism of this entry, as it shows compliance with the essential requirement of Section 28, Article 3, of the constitution, but the record in the House Journal is not as satisfactory. Strictly speaking, there is no record whatever in the House Journal of compliance or even attempted compliance with the requirements of Section 28. The journal is absolutely silent as to the signing of this bill. That it was signed, however, we know from an inspection of the enrolled act on file in the office of the Secretary of State, but whether it was signed in the presence of the House after the title had been publicly read can only be presumed, and such presumption is not warranted in a case like this where the constitution prescribes a journal entry. There is an entry to the effect that "The Honorable Speaker announced that he was about to sign the following *H. E. A.s.*" Then follows a list of seven H. E. A.s with their titles in full; then without any intervening head lines another list of twelve *S. E. A.s*, the last of which is S. E. A. No. 26, entitled Senate File No. 42, by Mr. McGill, and the title of which is given in full. From it we must, if possible, spell out compliance with the requirements of Section 28, Article 3. It may be contended that such requirements as those included in Section 28 are directory merely, as was held in the case of In re Roberts, 5 Colo., 525. And, therefore, attention is particularly directed to the following cases, because they are in point either directly or by close analogy:    Brewer v. Mayor, 86 Tenn., 732; O'Hara v.

State, 25 So. (Ala.), 622; Cohn v. Kingsley, 38 L. R. A., 74; Scarborough v. Robinson, 81 N. C., 409; State v. Patterson, 98 N. C., 660; Bank v. Commissioners, 119 N. C., 214; Board v. Smuggs, 121 N. C., 394; State v. Platt, 2 S. C., 150; State v. Haygood, 12 S. C., 46; Williams v. State, 6 Lea, 549; State v. Algood, 57 Tenn., 163; Hunt v. State, 22 Tex. Ct. of App., 396; In re House Bill 250, 87 Pac., 49.

This requirement was incorporated in the constitution with a well-defined purpose, and, therefore, there should be no evasion of its provisions.

"The signing of an enrolled bill by the Speaker or President is an essential act, which can only be done when the house over which he presides is in session and a quorum is present therein for the transaction of business." (Cushing's Law and Legislative Assemblies, 2374.) This being the rule, it is easy to understand the purpose and object of having the act of signing immediately entered in the journals, i. e., so that there will be a written record of the fact that such required act was performed in the presence of a legislative quorum. There have been instances where bills have not been signed at all, and there might as readily be instances where the signing did not take place legally and in the presence of a legislative quorum. It was to avoid such contingencies and such opportunities for fraud that the Constitutional Convention provided that the act of signing, which they regarded as essential, and which has been held by the courts to be a mandatory requirement, should be evidenced by a journal entry, as having been lawfully performed while the Legislature was in session and in the presence of a quorum and not in some surreptitious manner.

Constitutions are limitations on the exercise of legislative power, and any exercise of that power in excess of or contrary to those limitations should not be condoned or permitted by the judiciary; such would be the result if the Legislature was permitted to neglect the required entry in its journals of the fact of signing all bills.

There are numerous cases, including one in this State, to the effect that a constitutional requirement of a journal entry showing the aye and nay vote on the bill and the names of those voting must be strictly complied with, otherwise the law is void. These cases seem in principle to be directly applicable, and I am unable to find any real distinction between such constitutional requirements and one commanding a journal entry of the fact of signing a bill. Both relate to the exercise of a legislative power.

And it has been held repeatedly that a bill passed by less than the required number of votes and one lacking the signatures of the presiding officers are both invalid. Both the signing and the voting are exercises of legislative power essential to the validity of every law; are upon the same plan, and surrounded by similar safeguards and limitations; therefore, from these facts I deduce the following premises and conclusion:

First—Every bill to become a law must receive the votes of a majority of the members elected to each house. This is an essential legislative act and exercise of legislative power, and without this vote the bill is void.

Second—Every bill to become a law must be signed by the presiding officers of the House and Senate, respectively. This is an essential legislative act and the exercise of legislative power, and a bill without these signatures is a nullity.

Conclusion.—Concerning the exercise and performance of both of these essentials of legislative power the constitution has declared that a record shall be made; in the first instance by a yea and nay vote; in the second in the presence of the house over which the officer presides; and then, to the end that it may be publicly known by a permanent record whether these powers were exercised in the prescribed manner, it was further provided that the vote so taken, with the names of those voting, and the fact of such signing, shall be at once entered on the journal. Numerous authorities hold the first of these requirements to be

mandatory; hence by the closest analogy the same rule should apply to the second requirement, for it, too, is a direction concerning the manner in which the exercise of a legislative power shall be perpetuated of record, and not a mere matter of legislative procedure. The correctness of this theory is emphasized and sustained by a close examination of the different clauses of the constitutional section requiring the act of signing to be recorded on the journal, for while the section directs the signing to be done in the presence of the house, that fact is not required to be entered in the journal, and while it requires the title of the bill to be publicly read before signing, neither is that fact required to be entered in the journals, *but the fact of signing, the record of the essential act,* must be so entered, it doubtless being thought that if the journal is made to show the essential fact of signing, such entry would justify a presumption that the Legislature in the performance of its sworn duty had complied with the remaining provisions of the section as to the title having been read, and as to the signing having been done in the presence of the house. Where a section contains numerous limitations on legislative procedure, and on the exercise of legislative power, and one of these limitations relating to the exercise of legislative power is singled out for a journal record, it adds force to the assertion that the constitution makers particularly intended by this special mandate to preclude and prohibit the lawmakers from proceeding in any other manner than that indicated; and when this mandate is preceded by the imperative and positive direction "at once" it leaves no room for question as to the intent of those who framed and adopted the provision.

Carrying the analogy further, suppose the bill actually received the required number of votes to constitute a constitutional majority, and this fact be known to the Appellate Court, yet if the names of those voting be not recorded, the act is void, and it has been so held. (Smithee v. Garth, 33 Ark., 17.)

And so, too, even though the bill be actually signed, if the fact of signing be not entered in the journal, the bill is void. Section 28, Article 3, of the constitution, is one of that class of provisions that leaves nothing to presumption or to the discretion of the legislators. On the contrary, if no record appears and the journal is silent, it justifies the presumption that the requirement was not carried out in the prescribed manner. It does not answer the case to call attention to the fact that the enrolled bill is actually signed, for while this is true and is in itself evidence of the fact, *there is no evidence to prove where or under what circumstances the signing took place.* It was not thought wise to prove the performance of this important act by anything less than a journal entry made at the very instant of compliance, so that all might know from a positive record that the signing took place openly and in the prescribed manner. (State v. Swan, 7 Wyo., 181.)

In determining the manner in which the Legislature should have complied with the requirements of Section 28, Article 3, it is proper to ascertain what has been previous legislative construction of the particular section under consideration. (State v. Howell, 64 Pac. (Nev.), 466; Mining Co. v. Sewell, 11 Nev., 399; State v. Gray, 21 Nev., 378; 32 Pac., 190; People v. Loewenthal, 93 Ill., 191; Cohen v. Virginia, 6 Wheat., 264; People v. Dayton, 55 N. Y., 377.)

Therefore, as illustrating such construction, the following entries are quoted from legislative journals of different Wyoming Legislatures:

"The President announced that he had signed S. E. A. No. 29, An act providing for," etc. (Senate Journal First Legislature, page 456.)

"The Speaker announced that he had signed House Enrolled Act No. 17." (House Journal First Legislature, page 442.)

"Mr. President announced that he was about to sign Enrolled Act No. 6, Senate, An act, etc., * * * and did in the presence of the Senate affix his official signature to

each of said enrolled acts." (Senate Journal Second Legislature,. pages 396 and 397.)

"The Speaker announced to the House that he was about to sign Senate Enrolled Acts numbered from 8 to 11, both inclusive, and in the presence of the House attached his signature to said bills." (House Journal Second Legislature, page 379.)

"Mr. President announced that he was about to sign E. A. No. 2, Senate, An act, etc. * * * and Mr. President did in the presence of the Senate affix his official signature to each of said enrolled acts." (Printed Senate Journal Third Legislature, page 410.)

"Mr. Speaker here announced he was about to sign the following bills: House Enrolled Act No. 20, etc., etc. * * * There being no objection offered, he signed the same in the presence of the House." (Printed House Journal Third Legislature, page 353.)

"The President announced that he was about to sign E. A. No. 20, House, etc., etc. * * * and the President did in the presence of the Senate affix his official signature to E. A. No. 20, House, and E. A. No. 21, House." (Printed Senate Journal Fourth Legislature, page 343.)

"The Speaker announced that he was about to sign H. E. A. No. 18, An act, etc. * * * and there being no objection offered, he did so sign the same in the presence of the House." (Printed House Journal Fourth Legislature, page 362.)

"The President here announced that he was about to sign E. A. No. 4, Senate, An act, etc. * * * and the President did in the presence of the Senate affix his official signature to E..A. No. 4, Senate." (Printed Senate Journal Fifth Legislature, .page, 322.)

"Mr. Speaker then announced to the House the signing of the following bills: H. E. A. No. 52, etc., etc. * * * " (Printed House Journal Fifth Legislature, page 450.)

"And thereupon Mr. President did in the presence of the Senate affix his official signature to the following entitled

enrolled acts: Senate Enrolled Act. No. 18, etc. * * * "
(Printed Senate Journal Sixth Legislature, page 395.)

The foregoing journal citations clearly illustrate past
legislative construction, and clearly indicate that the several
Legislatures have regarded the section as mandatory in the
strictest sense. Furthermore, it appears from the journals
that, in the judgment of the members of the different legis-
lative bodies compliance did not mean an entry of an intent
to sign, but meant an entry of an *act performed*. Possibly
it will be contended that the entry found in the House
Journal of the Sixth Legislature to the effect that the
Speaker announced he was about to sign certain H. E. A.s
is compliance with the requirements of Section 28. Putting
aside for the moment the fact that this entry contains no
reference to S. E. A.s, still it is not compliance with the
requirement of the constitution, for at best it is but an an-
nouncement of an intent to perform the required act; the
constitution does not prescribe that there shall be a journal
entry of the intent, but of the fact of signing. A journal
entry of a contemplated act does not justify the inference
of the performance of such act when the fundamental law
prescribes the method and the only method for determining
such performance. Courts do not entertain such presump-
tions, and they give to words their proper and accustomed
significance; so that the phrase "was about to sign" can
scarcely be made to read "did so sign." (Ogden v. Saun-
ders, 12 Wheat., 332; Glidwell v. Martin, 51 Ark., 559;
Smithee v. Campbell, 51 Ark., 471; State v. Buckley, 54
Ala., 599; Weil v. Kenfield, 54 Cal., 111; Paving Co. v.
Hilton, 69 Cal., 479; State v. Brown, 20 Fla., 407; Green
v. Graves, 1 Douglas (Mich.), 351; Opinion of Justices,
35 N. H., 79; 52 id., 622; State v. Moffatt, 5 O., 359;
State v. Wendler, 68 N. W. (Wis.), 759; McCullough v.
State, 11 Ind., 430; Koehler v. Hill, 14 N. W., 745.)

It is a far cry to impute to the word "about" used as an
adverb such a meaning as would be necessary to reach such
a conclusion. This word is defined by different authorities

as follows: In readiness; intending; going; after the verb to be. (Century Dict.) And again: In readiness, as for business or action; at the point of; as about to speak; about to begin. (Standard Dict.) At the point or verge of; going; in the act of. (Webster's Unabridged Dict.)

In the journal entry under consideration the word "about" was used as an adverb and before the infinitive, hence the definitions above given seem to be conclusive that the use of the word "about" in that entry was a statement of an intended action to be taken by the Speaker of the House, and was not a statement of a completed or perfected action. This is a reasonable and sensible interpretation of the language used. Any other construction or interpretation is forced and unnatural. Finally, however, it may be stated as conclusive that the journal entry referred to shows no greater compliance with the requirements of the constitution in respect to Senate File 42 than if there was no journal entry at all, and in fact as to Senate File 42 there is no journal entry either of an intended purpose to sign, or of an actual signing.

The authorities cited represent the great weight of authority, and both as to numbers and respectability fully sustain the several propositions of law announced. It would be strange indeed if years of constitutional construction by the courts of these American commonwealths had not produced some diversity of opinion, and I have called attention to the few adjudicated cases holding different views from those represented by the great weight of authority. Of these a certain class, such as State v. Long, 21 Mont., 26, I do not consider at all in point, as they were decided upon the authority of Reed v. Jones, 6 Wash., 452, and Governor v. Missouri, 23 Mo., 353, both of which hold the enrolled act conclusive, contrary to the American rule as adopted in the case of State v. Swan, 7 Wyo., 165. Nor do I regard such cases as In re Roberts any more directly in point, for while the Colorado court in that case said that its holding was amply sustained by authority, no authorities were cited; and, furthermore, as hereinbefore shown, the

Colorado court in a later case has arrived at a very different conclusion as to the mandatory character of constitutional provisions.

In other states where questions similar to those involved here have been before the courts, some mention has frequently been made by counsel and others of the disastrous consequences that might result from declaring void statutes of the character of Senate File 42. Where laws are corrective of the morals and habits of a people, it is natural that those most interested in improving the moral and sociological conditions of the commonwealth and in protecting its youth from unnecessary temptations should feel deep interest in the possible invalidity of statutes passed as the result of their efforts and which in their judgment will safeguard the young and accomplish the purposes named, and this feeling naturally leads to suggestions to the judiciary concerning the expediency of declaring such statutes invalid.

While I am in sympathy with the enactment and enforcement of any law that makes for better citizenship, at the same time I believe arguments based upon expediency, if made at all, should more properly be addressed to a Legislature than to a court; for if in the performance of its duty the Legislature has failed to pass its acts in compliance with the fundamental law, such acts must fall, and this court cannot on the ground of expediency vitalize them. This is a forum where the principles of law and not what is expedient control. (Story on the Constitution, 426; State v. Swift, 69 Ind., 505; Koehler v. Hill (Ia.), 15 N. W., 609.)

*Walter R. Stoll,* for respondents.

When the so-called gambling bill was before the Legislature, I was not professionally employed by either side, and took no interest whatever in the controversy, except such interest as I usually take in all measures that have for their object a higher and better citizenship or better conditions.

After the Legislature adjourned, as the legal adviser of the County Board of Laramie County, I was called upon

to advise with relation to the refunding of county bonds, and as a bond measure had been passed by the Legislature, I deemed it my duty to investigate the passage of this particular measure, and in doing so I examined the journals of the two houses on the subject of the gambling bill, and, believing that some contest would arise with reference to this measure, I investigated the journals and the bill and all other matters pertaining to its passage. Finding the journals of one of the branches of the Legislature incomplete in many particulars with relation to various bills, I made quite a thorough examination of both journals, with relation not only to the gambling bill and the bond bill, but with relation generally to all bills. I investigated the authorities bearing upon the questions that would undoubtedly be raised, so as to be prepared to act intelligently when the matter should be submitted to me.

When the applications for gambling licenses were made I had arrived at the conclusion that the act was invalid; and, inasmuch as the particular question had never been passed upon by this court, I deemed it proper that such measures be taken as would bring the case to the attention of this court as soon as possible. Acting upon my advice, the respondents treated the published act as a valid law, and refused to do the various acts required of them to be done by the former statute, the repeal of which was attempted to be accomplished by the measure in question.

I suggested to the respondents and the County Board the advisability of some other attorney representing them in the contest which was instituted by the relator, but the board and these officers declined to employ any other attorney, and I deemed it my duty to act in the premises, the respondents desiring simply to do their duty under the law.

I present this brief as a result of the conclusions arrived at from my examination of the authorities. And while I am constrained to say that, in my opinion, the measure is not a valid one, I say it without being influenced as a partisan or an advocate for any particular idea.

It would be most agreeable to me if this court would call upon some other attorneys whose views may be different from mine, and who may be able to point out the errors if any in my judgment.

This court is not bound from the conclusions in State v. Swan, 7 Wyo., 166, to hold that the gambling bill is invalid. It is submitted, however, that the case emphasizes the conclusion that provisions of our constitution requiring a specific thing to be done and to be entered upon the journals are mandatory provisions. It must inevitably follow, from the logic of that case, that the provision of our constitution which requires the fact of the signing of a bill to be entered upon each journal is an absolutely mandatory provision. The fact that the journal shows that the Speaker was "about to sign" is clearly, to my mind, not a statement that he did sign.

Unquestionably there is an enrolled act properly signed by the presiding officers of both houses and the Governor, and lodged in the office of the Secretary of State. Under all the authorities, it seems that there must be some presumption of regularity attending the existence of such an act so signed and deposited. The Senate Journal shows that every necessary constitutional requirement was complied with. The House Journal shows the same thing, except as to the last entry. The exception, however, must be made as to both journals that they show that the bill was never referred to any committee except to the Committee of the Whole.

The whole inquiry sifts itself down to the simple proposition, can this court, under the logic of the Swan case, hold that the entry of the House Journal to the effect that the Speaker was "about to sign" such bill is the equivalent of the statement of that journal that the Speaker did in fact sign the bill?

Since the decision in the Swan case the following cases have been published, and have passed more or less directly upon this question. They may be separated into two

classes—first, those that, in principle at least, sustain the proposition that the entry in the House Journal is insufficient, and that the logic of the Swan case would require the court to declare the law void, and, second, those cases which, on the contrary, hold the bill to be valid. First class: Smathers v. Commissioners, 125 N. C., 480; Commissioners v. Snuggs, 121 N. C., 394; State v. Mason (Mo.), 55 S. W., 636; Board v. Coler, 96 Fed., 284; Ex parte Iron Co., 119 Ala., 484; O'Hara v. State, 121 Ala., 28; Fillmore v. Van Horn (Mich.), 88 N. W., 69; Commissioners v. Derosset, 129 N. C., 275; Cotton Mills Co. v. Waxhaw, 130 N. C., 293; Hooker v. Greenville, 130 N. C., 472; Debnam v. Chitty (N. C.), 43 S. E., 3; State v. Davis (Neb.), 92 N. W., 740; Simpson v. Union Stock Yds. Co., 110 Fed., 799; and see also Hunt v. State, 22 Tex. App., 296.

The conclusion seems to fairly follow from the foregoing cases that while in none of them was the particular question involved in the case at bar raised, and while the silence of the journals is considered the equivalent of the regularity of the acts of the Legislature, these presumptions of regularity do not go so far as to supply an omission of any fact which the constitution imperatively requires to appear or to be noted in the journals. In other words, they all sustain by the clearest kind of reasoning the proposition that a mandatory provision of the constitution must be complied with, and inferentially, at least, lead to the logical deduction that a statement that the Speaker of the House was "about to sign" a bill cannot be considered the equivalent of a statement that the Speaker of the House had signed the bill, when such fact is required to be stated by a constitutional provision.

It will be noted that in several of the foregoing cases the court indulges the presumption that the silence of the journals was not sufficient to overcome the presumption of regularity of the proceedings, but in each instance this silence was concerning some matters which were not required to be entered upon the journals, and the court expressly

limit the presumption of regularity to all such matters as are not required by mandatory provision of the constitution to be entered.

The following cases, besides sustaining the above conclusion, are significant in connection with a statement which I understand has been made, that the entry on the journal that the Speaker is now "about to sign" is the equivalent of signing, to-wit:  Opinion of Justices, 52 N. H., 622; Smithee v. Garth, 33 Ark., 17;  State v. Brown, 20 Fla., 407;  Cohn v. Kingsley (Idaho), 38 L. R. A., 74;  Glidewell v. Martin, 51 Ark., 559.

Undoubtedly the statement of the House Journal that the Speaker was "about to sign" the bill followed by the filing of the bill in the office of the Secretary of State with the signature of the presiding officer of the House and signed by the Governor would justify the presumption that the bill was signed by the Speaker of the House, and the further presumption that it was signed as the law requires it to be signed, namely, in the presence of the House, were it not for the fact that the constitution requires that the fact of such signing must be noted on the journal.

Cases of the Second Class.—The following cases in principle, and as applied to the facts, are directly contrary to the foregoing cases, and contrary to the proposition laid down by this court in the Swan case:  Homrighausen v. Knoche, 58 Kan., 646; State v. Long, 21 Mont., 26;  State v. Jones, 6 Wash., 452; State v. Beck, 56 Pac., 1008; R. R. Co. v. Governor, 23 Mo., 353; In re Taylor, 55 Pac., 340 (Kan.) ;  Council v. Schmid, 87 N. W., 383 (Mich.).

Referring Bill to Committee.—I have not been able to find any case in which this question has been raised.  But the following cases, it is believed, are the same in principle. The requirement of the constitution in each of the following cases was that the bill should be printed:  In re House Bill, 26 Colo., 234;  Ins. Co. v. Colo. L. & T. Co., 36 Pac., 793;  Clelland v. Anderson (Neb.), 92 N. W., 306.

*William B. Ross, Amicus Curiae.*

The constitution does not require to be entered on the journal the fact that the bill was referred to a committee, and the courts will presume that it was referred to a committee until the contrary *"clearly appears;"* and the contrary does not "clearly appear," because as to this matter the journal is absolutely silent. The law on this point is overwhelming, thirty-eight states having decided that it must clearly appear not to have been done, or else it will be presumed to have been done, and no state, so far as I can learn, has decided differently. Any other presumption would be that the members of the Legislature had violated their oaths to support the constitution.

When the journal is silent the law presumes that done that ought to have been done. The presumption is that the members did their duty, and not that they failed to do their duty and violated their oaths. The presumption is that the bill was signed by the Speaker and was signed in the presence of the House, and this settles the matter until the contrary clearly appears. In addition to such presumption, there is evidence to prove that it was done. The journal of the House states that the Speaker announced that he was about to sign "the following H. E. A.s;" and his name is affixed to the bill.

The question is whether there was a clerical error in not entering on the journal after the Speaker did sign it that it was so signed. My contention is that all record of signature in the presence of the House is within the meaning of the constitution and complies substantially with every essential requirement of the constitution.

It is apparent that the expression, "The Honorable Speaker announced that he was about to sign the following H. E. A.s," was intended to include both House and Senate enrolled acts, and is simply a false description. The law on this point is clear. *"Falsa demonstratio non nocet."* A false description does not vitiate. This maxim applies to all written instruments, including constitutions. "The Honor-

able Speaker announced," of course, means that he announced to the House; and if he did announce to the House he must have been in the presence of the House. His signature is found attached to the bill. The expression, "The Honorable Speaker announced that he was about to sign the following H. E. A.s," was a notation entered on the journal to show that the bill was signed then and there in the presence of the House. The Supreme Court, to interpret what the entry on the journal means, must look *to the meaning intended to be conveyed,* and not to mere words. The clerk entered upon the journal what he considered sufficient to cover the constitutional provision; the journal was read the succeeding morning to the House, and the members considered the constitutional requirements complied with and adopted the entries on the journal as read. The form used was one that had been used more than any other since the constitution had been adopted, and this form had become a custom. There are no exclusive words in the constitution requiring certain language to be used or negativing the use of any other language. Any language that expresses the idea that the bill was signed in the presence of the House by the Speaker does comply with the provision of the constitution and is all that is necessary.

Who shall dictate to the Legislature what language they shall use in entering on their journals the fact that the bills were signed by the Speaker in the presence of the House, provided that every essential requirement of the constitution is complied with? Because the language they used was not identical with that which the counsel for relator might have used, or that which the court might have thought best, is no reason that the language they did use was not in accordance with the constitutional requirements. But the entry they have adopted is the one that has been used by every Legislature, with the exception of about three or four, since this State was admitted into the Union.

"In case the real intention, as deduced from the instrument itself, is not indicated by the literal sense of the terms

employed, the former must prevail over the latter. *And where the literal interpretation involves any palpable absurdity, contradiction or, as it has been held, any extreme hardship or great injustice, the courts have deviated a little from the literal meaning of the words, and interpreted the instrument according to the apparent intent of its authors."* (6 Ency. L. (2d Ed.), 924.)

It was not the intention of the framers of the constitution to invalidate half the laws of the State because this one provision of the constitution was not complied with. And it surely was the construction put on the constitutional provision by the Legislature, or else they would have required the journal entries to have been made differently.

In the agreed statement of facts is found this statement: "That the enrolled copy of said Senate Enrolled Act No. 26, *duly* signed by the President of the Senate and the Speaker of the House of Representatives, and approved by the Governor, is now on file in the office of Secretary of State." This is a direct admission that the enrolled *copy of said Senate Enrolled Act No. 26 is duly signed by the President of the Senate and the Speaker of the House of Representatives.*

But even if the language used by the Legislature in making the entry showing that the bill was signed by the Speaker in the presence of the House is not sufficient to cover the provision of the constitution, it does not for that reason invalidate the law, because the provision in the constitution is in regard *to the mode or course of procedure in the enactment of laws, and is directory and not mandatory.* (8 Cyc., 761; 6 Ency. Law (2d Ed.), 928; Washington v. Page, 4 Cal., 388; Miller v. State, 3 O. St., 484; In re Roberts, 5 Colo., 535; People v. Supervisors, 8 N. Y., 318; Cottrell v. State, 9 Neb., 125; McClinch v. Sturgis, 72 Me., 288; Pim v. Nicholson, 6 O. St., 177; Rumsey v. People, 19 N. Y., 41; R. Co. v. Governor, 23 Mo., 353; Anderson v. Baker, 23 Md., 531; McPherson v. Leonard, 29 Md., 377; Swann v. Buck, 40 Miss., 292; Com. v.

Clark, 7 W. & S., 127; City v. Riley, 52 Mo., 434; Hall v. Bank, 15 W. Va., 323; In re Baldwin, 7 Heisk., 414; Commissioners v. Meekins, 50 Mo., 29; Pierpont v. Crouch, 10 Cal., 315; In re Min. & Milling Co., 51 Cal., 624; Ohio v. Covington, 29 O. St., 116; Oshe v. State, 37 O. St., 494; Weil v. State, 46 id., 451; Davis v. Wood, 7 Mo., 162; Schulherry v. Bordeau, 64 Miss., 70; State v. Mead, 71 Mo., 268; Com'rs v. Higginbotham, 17 Kan., 74.)

There is no prohibitive clause in the provision under consideration. What object was there in inserting a prohibitive clause in some sections and not in others, unless it was intended to make a distinction? Clearly many provisions of the constitution are directory; such, for instance, the provision for the hour of the assembling of the Legislature. A disaster might occur, rendering the meeting at the hour impossible. If the Legislature should not convene until some hours later, would all laws be invalidated? Again, the provision for having a census taken has not been complied with.

Three-fourths of all the statutes of the State depend upon the decision of the questions in the case at bar. Rights have grown up under many of such statutes, and public policy seems to require that the provision of the constitution should be held directory merely. (8 Cyc., 733, 737; Washington v. Page, 4 Cal., 388; Rumsey v. People, 19 N. Y., 42; Com'rs v. Higginbotham, 17 Kan., 74.)

The Senate Journal of the preceding Legislature (the Fifth) states that "the President here announced that he was about to sign Enrolled Act No. 46," and others named. The House Journal of the same Legislature that "Mr. Speaker thereupon announced the signing of the following bills." These forms were employed almost throughout the entire journals of that Legislature. In the Second Legislature the journal states that "The Speaker announced that he was about to sign S. E. A. No. 6 and H. E. A. No. 15, the latter being the general appropriation bill." "Mr. Speaker notified the House that he was about to sign House

Enrolled Acts numbered from 21 to 23, both inclusive."
"The Speaker announced to the House that he was about
to sign S. E. A. numbered from 8 to 11, both inclusive,
and in the presence of the House attached his signature to
said bill." I am unable to find in that journal another entry
similar to the one last quoted. Some stated that the Speaker
announced that he had signed certain acts.

Of course the Speaker was in the presence of the House
when he *announced* he had signed the bills, but where was
he when he signed them? The form used, however, is a
substantial compliance with the provisions of the constitu-
tion, but not any more so, however, than the entry, "The
Honorable Speaker announced that he was about to sign
the following H. E. A.s." The meaning and intention are
too clear to be misunderstood.

Statutes are always presumed to be constitutional, and
this presumption will be indulged in by the courts until the
contrary is clearly shown. This rule is one of universal
application, and the principle is equally well established that
statutes will be so construed, wherever it is possible to do
so, so that they shall harmonize with the constitution, to
the end that they may be sustained. *Such a construction is
regarded as a duty of the court, in passing upon the consti-
tutionality of an act of the Legislature.* (Park v. Chandler,
113 Ga., 647; 10 Century Digest, Par. 46, p. 1303, and cases
there cited.)

Suppose there was such a clerical error as the counsel for
relator contends; does such an error justify the wrecking of
our whole system of laws? For upon this same clerical
error depend three-fourths of the laws of Wyoming; the
laws of the First, Second, Fifth and Sixth Legislatures and
the laws passed by the other three Legislatures which were ·
based upon the laws enacted by these Legislatures, such as
amendments which would be meaningless standing alone.
The result would be terrible and far-reaching. It would
mean annihilation to all the rights grown up during the
last fifteen years; absolute destruction of all work ac-

complished by four of our seven Legislatures; it would give to the Chief Clerk of the House more power than to the Governor.  All this would be sacrificed because mere formal and immaterial words, not of the essence of the law and which constitute no part of the law, were omitted.

Half the inmates of our state prisons would have to be admitted to have been unconstitutionally convicted and incarcerated.  There would be no protection for the weak and innocent, and no restraint for the strong and wicked.  Every cold-blooded murderer, every unscrupulous, conscienceless person would go unpunished, sheltering himself under the unconstitutionality of the law.  He would be bound by no law, because there would be no law if this particular law be declared invalid; for this one cannot stand alone and apart from all others enacted by the same process.  It must receive the same treatment that all the laws similarly enacted in the last fifteen years receive.  Suppose such a technical error does exist.  Is it of such importance that it justifies the undermining of a majority of the most important laws of our State?  If so, then we would further demand that every "i" be dotted and every "t" be crossed.  Such is not the spirit of the law.  I cannot see how we can invalidate a multitude of laws of inestimable value to support such a technicality as this.  "The constitution is to be interpreted so as to carry out the great principles of the government, not to defeat them."

*Charles W. Burdick,* in reply.

Counsel first endeavors to convince the court that constitutional provisions are directory rather than mandatory, citing cases from Ohio, New York, Maryland, Missouri, Tennessee, Colorado, California, Maine, Mississippi and Kansas.

In reply, I have simply to say that all of these states, excepting possibly Maine and Mississippi, have either directly or by fair inference, in cases decided since those cited by counsel, held constitutional provisions to be man-

datory, and in such states as Ohio and Colorado have held provisions almost identical with Section 28, Article 3, mandatory.

Cal.—People v. Dunn, 80 Cal., 211; R. R. Tax Cases, 15 Fed., 766; Weil v. Kenfield, 54 Cal., 111.

Ohio—Ex parte Falk, 42 O. St., 640; State v. Kieswater, 45 O. St., 254.

Colo.—In re Breen, 14 Colo., 403; In re House Bill 250, 26 Colo., 234.

New York—People v. Hills, 35 N. Y., 449; People v. Lawrence, 36 Barb., 186.

Neb.—The clause of the Nebraska constitution considered in the case cited by counsel, *i. e.,* Cottrell v. State, 9 Neb., 125, did not prescribe a journal entry. However, the later cases cited in my brief are conclusive as to the position of the Nebraska courts, and put that state in line with Illinois and other states holding all constitutional provisions mandatory.

Maine—The Maine case cited is not in point, but I will concede that the Maine court has intimated that, under certain circumstances, constitutional provisions are directory only.

Missouri—State v. Miller, 45 Mo., 496; State v. Mead, 71 Mo., 268.

Maryland—Berry v. Balt. & D. T. R. R., 41 Md., 446; Leggett v. Mayor, 42 Md., 203.

Mississippi—The case cited from Mississippi is one of four from four different states holding the requirement that all laws shall be entitled, "Be it enacted," etc., directory only. On the other hand, no less than thirteen states had, at the date of State v. Rogers, 10 Nev., 250, decided July, 1875, held similar provisions mandatory, and today the number is something over twenty-five.

Pennsylvania—The Pennsylvania case cited is not in point, except on the general proposition as to the proper construction and interpretation of constitutions, and on that there is no issue in this case.

West Virgina—Lemons v. State, 4. W. Va., 755.

Kansas—The position of the Kansas courts is peculiar. They favor the English, but follow the American rule, examining not only the authenticated journal and *also the clerk's memorandum journals.* They appear to regard the requirements of the constitution as imperative, but at the same time go farther than any other court in presuming compliance.   (Homrighausen v. Knoche, 58 Kan., 64.)

Tenn.—Cannon v. Mathes, 8 Heisk, 504;  Brewer v. Mayor, 86 Tenn., 732;  State v. Algood, 87 Tenn., 163.

If rules of statutory construction were applicable to constitutional provisions, the absence or presence of prohibitory .words would be important, but it seems well settled that other rules govern, and that all positive directions, such as "Each house shall keep a journal," etc., "The enacting clause of every law shall.be as follows: 'Be it enacted,' etc.," "The ayes and nays shall be taken on any subject at the request of five members and entered on the journal," "No bill shall contain more than one subject," "The presiding officers shall sign every bill," etc., are as imperatively commanding as though each of the sentences above quoted were preceded by a clause of prohibitory words.

Another ·point made by counsel is that the intent of the *instrument* should govern, and then from this premise he argues that the intent of the *Legislature* should govern.

I agree that the intent of the instrument, the constitution, should govern, and that the journal entry therein prescribed of "the fact of signing" should appear on the journal, but as to the intent of the Legislature, I insist that it only governs when expressed in the manner prescribed in the constitution.   (Cooley Const. Lim., 93, 168, 179, 180.)

Counsel asserts that the validity of three-fourths of all the laws of the State depend upon the decision in this case, and that if the act under consideration is declared unconstitutional, then the laws enacted by the First, Sec-

ond, Fifth and Sixth Legislatures must "*in justice be invalidated.*" How he has ascertained as a fact in this case that three-fourths (or the entire system, as he says later in his conclusion) of the laws of Wyoming depend upon the decision of the court in this case, he does not say, nor does he inform the court by what procedure, or in what form of action, the acts of the First, Second, Fifth and Sixth Legislatures are "to be in justice invalidated," or in what respect such proceeding would in any respect square with public policy, he does not explain. If when in a proper proceeding a court has declared the unconstitutionality of a statute it be true that public policy also requires that court "in justice invalidate" all statutes merely asserted to be of the same class, whether properly before the court or not, then we are indeed in danger from the application of a principle supposed to be beneficial and equitable.

"The term 'public policy' is frequently used in a very vague, loose or inaccurate sense. The courts have often found it necessary to define the judicial meaning and have held that a state can have no public policy except what is to be found in its constitution and laws. * * * Therefore, when we speak of the public policy of the state, we mean the law of the state, whether found in the constitution, the statutes or judicial records." (People v. Hawkins, 157 N..Y., 12.)

On the one hand, the loss of the statute can be easily replaced by any succeeding Legislature, and the public are taught that the constitution must be obeyed, so that if the loss of a statute is a misfortune, it is one that can be quickly remedied. On the other hand, if as the result of sustaining the statute the impression gets abroad that requirements of the constitution need not be obeyed, or that half compliance is sufficient, the seed of disregard and disrespect for fundamental law will be planted in the minds of the citizens of the State and may lead to results most disastrous.

It would be a dangerous precedent to establish that courts may correct journal entries. It would mean that in any case where the journals failed to record the names of those voting in the affirmative, even though the names of the absentees and those voting in the negative appeared on the journal, the court could supply the missing names, and thus perform judicially a duty enjoined on the Legislature. And its effect would be to destroy all confidence in legislative journals as records implying verity.

POTTER, JUSTICE.

February 21, 1902, the petition of the relator was filed in the District Court for the County of Laramie, praying for a writ of mandamus to require the respondents, the County Clerk, Treasurer and Sheriff, respectively, of said County of Laramie to prepare, issue and deliver to the relator two licenses, authorizing him to carry on in a certain place designated in the City of Cheyenne, in said county, the games of faro and roulette for the period of three months from the 21st day of February, 1902. It was alleged in detail that all the things required to be performed by the relator to entitle him to such licenses under the provisions of Sections 2151, 2152, 2179, 2181, 2182 and 2185 of the Revised Statutes, had been done and performed; and that said provisions were in full force and effect. It is further alleged that the respondents had refused to perform their respective duties in the premises, and gave as the reason for their refusal that the laws theretofore authorizing the licensing of such games had been repealed by the provisions of Chapter 65 of the Laws of 1901, being an act entitled, "An act to amend and re-enact Sections 2178, 2180 and 2183 of the Revised Statutes of 1899, and to repeal Sections 2179, 2181, 2182, 2185, and 2186 of the Revised Statutes of 1899, relating to gambling."

The original respondents were Dallas R. Cowhick, as County Clerk; John Schuneman, as Treasurer, and Edwin

J. Smalley, as Sheriff of the County of Laramie. Joseph A. Cahill, the present County Clerk, has been substituted in place of Dallas R. Cowhick, deceased; and John E. Vreeland, present County Treasurer, has been substituted for John Schuneman.

The petition sets forth that Chapter 65 of the laws of 1901 was and is wholly void, and was never enacted by the Legislature for the alleged reasons that before the same was considered, and before its passage, the bill was not referred to a committee as required by the provisions of Section 23 of Article 3 of the constitution; and that neither the act, nor the bill therefor, was ever signed by the Speaker of the House of Representatives in the presence of the House, as required by the provisions of Section 28 of said article; and that the fact of such signing was not entered upon the journal of the House as required by the provisions of said Section 28. Separate answers were filed by the respondents, setting forth the proceedings had and taken in the House of Representatives in respect to the matters complained of, and admitting that if such proceedings did not amount to a compliance with said constitutional provisions then there had been a failure to comply with them.

The cause was submitted to the District Court upon an agreed statement of facts, the material parts of which are as follows:

"That the official duties of the said respondents referred to in paragraphs three, four and five of relator's petition are the official duties prescribed in Sections 2151, 2152, 2179, 2181, 2182 and 2185 of the Revised Statutes of Wyoming, 1899.

"That on the 21st day of February, A. D. 1902, the relator requested said respondents to prepare, countersign and issue to him two licenses, one for a game of faro and one for a game of roulette, authorizing the said relator to carry on said games in a room located in the City of Cheyenne; and that respondents refused to comply with the said request of relator.

"That Chapter 65 of the Laws of Wyoming, A. D. 1901, was introduced in the Senate of the Sixth Legislature of Wyoming under the caption of Senate File No. 42, and is referred to in the journals of the Senate and House of Representatives of the Sixth Legislature of Wyoming as Senate File No. 42 and as Senate Enrolled Act No. 26.

"That the enrolled copy of said Senate Enrolled Act No. 26, duly signed by the President of the Senate and the Speaker of the House of Representatives and approved by the Governor, is now on file in the office of the Secretary of State, and that the printed copy of said act as it appears in the printed and bound volume of the Session Laws of the Sixth State Legislature of Wyoming, under the title of Chapter 65, is a true and correct copy of the original enrolled act on file with the Secretary of State, excepting that said printed copy does not show the signatures and endorsements appearing on said enrolled act.

"That the record of legislative procedure pertaining to said Senate File No. 42 appears in the duly approved original Senate and House Journals of the Sixth State Legislature of Wyoming, now deposited in the office of the Secretary of State, and in the printed copy of said journals printed and issued under the direction of the Secretary of State; and said journals are hereby made a part of this agreed statement of facts."

Upon the submission of the cause on May 27th, 1902, the District Court, finding that important and difficult questions arose in the case, ordered that the cause be reserved and sent to this court for its decision upon the following questions:

First—Does Chapter 65 of the Laws of the Sixth State Legislature of Wyoming contravene the provisions of Article 3, Section 24, of the constitution?

Second—Are the provisions of Article 3, Section 23, of the constitution directory or mandatory?

Third—Was the reference of Senate File No. 42, being Chapter 65 of the Laws of the Sixth State Legislature, to

the Committees of the Whole of the Senate and House of Representatives, and to the Senate and Joint Committee on Printing, and to the Senate Committee on Engrossment and Enrollment, as said references appear of record in the journals of the Senate and House of Representatives of the Sixth State Legislature a sufficient compliance with the requirements of Article 3, Section 23, of the constitution?

Fourth—Are the provisions of Article 3, Section 28, of the constitution, directory or mandatory?

Fifth—If the provisions of Article 3, Section 28, of the constitution, are mandatory, do the journals of the Senate and House of Representatives of the Sixth State Legislature show that Senate File No. 42 was enacted in compliance with such mandatory requirements?

Sixth—Is Chapter 65 of the Laws of Wyoming for the year 1901, being Senate File No. 42 and Senate Enrolled Act No. 26, a valid and constitutionally enacted statute of Wyoming?

Seventh—Are Sections 2151, 2152, 2179, 2181, 2182 and 2185 of the Revised Statutes of Wyoming, 1899, now in full force and effect?

The said questions were reserved and the cause docketed in this court prior to the act of 1903 limiting the right of the District Court to reserve questions to this court to such as are constitutional in character. Hence the case would be properly here, did it not involve constitutional questions. But the questions involved are constitutional and come strictly within the act authorizing the reservation of questions as now in force.

On the argument in this court no contention was made that Chapter 65 of the Laws of 1901 was invalid because of any failure to comply with the provisions of Section 23 of Article 3 of the constitution, or of any violation of Section 24 of the same article; but all objections in respect to the requirements of those sections were expressly abandoned. The objection to the validity of the act was distinctly confined to the alleged failure of the journal of the

House of Representatives to show affirmatively a compli-
ance with Section 28 of said article.   Hence it will be
unnecessary for us to consider either the first, second or
third questions stated in the order of the District Court.

The right of the relator to the relief demanded by his
petition depends altogether upon the alleged invalidity of
the act known as Chapter 65 of the laws of 1901.   By that
act it was declared that "every person who shall deal,
play, carry on, open, or cause to be opened, or who shall
conduct, either as owner or employee, whether for hire or
not, any slot machine, game of faro, monte, roulette, * * *
or any other game played with cards, dice or other device
of whatever nature, for money, checks, credits or other
representatives of value, shall be guilty of a misdemeanor,
and on conviction thereof shall be punished by a fine of
not less than three hundred nor more than one thousand
dollars, or by imprisonment of not less than three months
nor more than one year, or by both."   And the sections of
the statute theretofore in force providing for the licensing
of certain games, including the games of faro and roulette,
were declared to be repealed.

It is contended on behalf of the relator that the pro-
visions of Section 28 of Article 3 of the constitution were
not complied with in respect to said act, and that in conse-
quence thereof the said act is void, and the sections con-
tinue in force, which it purported to repeal.

The constitutional provision referred to reads as follows:

"The presiding officer of each house shall, in the pres-
ence of the house over which he presides, sign all bills and
joint resolutions passed by the Legislature immediately
after their titles have been publicly read, and the fact of
signing shall be at once entered upon the journal:"

It is conceded, and such is unquestionably the fact, that
the act in question bears the signature of the presiding
officers of the Senate and House of Representatives, and
of the Governor approving the same.   And it is deposited
in the office of the Secretary of State, and has been pub-

lished among the other laws of that session, as one of the duly passed and approved laws of the State. The presumption, therefore, would be that it was regularly passed; and the enrolled act in the office of said Secretary authenticated as aforesaid is to be taken as *prima facie* evidence that the act was duly and regularly passed pursuant to all the constitutional provisions affecting the enactment of laws, and duly and properly authenticated and approved.

But the act is challenged on the ground that the journal of the House of Representatives fails to show the fact of signing. It is contended that as the constitution expressly requires the fact of signing to be entered on the journal, the latter record, when the validity of the authentication by the presiding officer is questioned, constitutes the only evidence as to compliance with the provision of the section of the constitution under consideration. It is argued that if the journal is silent respecting the fact of signing, the presumption is justified that the requirement was not carried out in the prescribed manner; and that the constitution having designated how the evidence of signing shall be perpetuated, viz: by an entry on the journal, it is not within the province of the courts to look elsewhere for evidence of compliance, nor to indulge a presumption of compliance from the presence upon the enrolled act of the signature of the proper officer. It is conceded, however, that, as the only journal entry required is of the fact of signing, when such an entry appears, it will be presumed therefrom that the signing occurred in the presence of the body over which the officer presided, and after the title of the act had been publicly read. Indeed, since the journal is a record of only those acts and proceedings which occur in the presence of the legislative body and while it is in session, it is a reasonable and logical conclusion that a journal entry showing the signing of a bill by the presiding officer shows thereby that the signing occurred in the presence of the House or Senate, as the case may be. But the concession of counsel, as we understand it, is based

not alone upon that presumption, but also upon the prop-
osition that the constitutional requirement of a journal
entry in this respect extends only to the fact of signing;
and that an entry showing more than that is not required.

In support of the contention of relator, it is maintained,
first, that it is competent for the courts to consult the leg-
islative journals in reference to those matters which are
expressly required by the constitution to be therein re-
corded, concerning the procedure in the enactment of laws,
and that such journals may be used to impeach the en-
rolled act; second, that the journals imply verity, and can-
not be impeached by parol evidence, or by an entry of a
later date, or by the minutes or memoranda kept by the
clerk; third, that the provisions of Section 28 aforesaid
are mandatory; and, fourth, that the fact of signing the
act in question by the Speaker of the House of Representa-
tives was not entered upon the journal of the House.

It was held in Brown v. Nash, 1 Wyo., 85, by the Su-
preme Court of the Territory, that the courts have power
to examine the journals of the Legislature to ascertain
whether or not there has been an observance of the requisite
procedure in the passage of laws. In State ex rel. v. Swan,
7 Wyo., 166, this court held that it is competent for the
courts to consult legislative journals in reference to a mat-
ter expressly required by the constitution to be recorded
therein, concerning the constitutional procedure for the
passage of a legislative enactment; and that where it
affirmatively appears upon such an examination, in re-
spect to such requirements, that a bill did not, in fact, pass
the Legislature, or did not receive the constitutional ma-
jority, the journals may be used to impeach the enrolled
act. In that case the journals were resorted to, and it was
held that it affirmatively appeared therefrom that the act
then under consideration had not in fact been passed by
the Legislature.

It was said in the Swan case that, "When the keeping of
legislative journals is enjoined by the constitution, and

that instrument also attaches certain conditions to the en-
actment of a valid law, and the facts showing a compliance
therewith are required to be entered upon the journals, the
decided weight of authority in this country favors the re-
sort to such journals to determine whether the law has
been enacted in a constitutional manner." And a large
number of cases were cited. We did not then hold, nor
do we now hold, that the journals are competent evidence
to impeach the enrolled act in respect to every particular
required even by the constitution as a part of the procedure
in the passage of bills, nor is it necessary to consider that
broad question. But we are satisfied both upon reason and
authority that they are competent evidence concerning any
procedure which the constitution expressly declares shall
be made a matter of journal record; and as decided in the
Swan case an affirmative showing by the journals in refer-
ence to such procedure that the bill was not passed in a
constitutional manner is competent to overthrow the or-
dinary presumption arising from the enrolled act.

It is difficult to perceive any sound reason for a pro-
vision in the constitution commanding that the journals
shall record the action of the Legislature upon certain
essential matters of procedure in the passage of laws unless
they are to be regarded as evidence for some purpose of
such action. Otherwise, though stated in the most positive
or prohibitive language, the constitutional command that
certain procedure shall be followed would operate in prac-
tice as a mere check upon the conscience of the Legislature,
to be obeyed or not at pleasure, without interference by
the courts.

The arguments of counsel have been largely directed to
the questions whether the constitutional provision aforesaid
respecting the signing of every bill by the presiding officer,
and the journal record thereof, is mandatory or directory;
and whether the entry as made constitutes a sufficient com-
pliance with such provision.

The authorities are not harmonious upon the question
whether this particular provision and provisions of the

same general character are to be regarded as mandatory.
Judge Cooley, in his work on Constitutional Limitations,
quite freely expresses his view that constitutional provis-
ions concerning the procedure in the enactment of laws are
imperative and mandatory. Referring generally to the
question, that eminent author and jurist says:  "But the
courts tread upon very dangerous ground when they ven-
ture to apply the rules which distinguish directory and man-
datory statutes to the provisions of a constitution.  Con-
stitutions do not usually undertake to prescribe mere rules
of proceeding, except when such rules are looked upon as
essential to the thing to be done; and they must then be
regarded in the light of limitations upon the power to be
exercised.  It is the province of an instrument of this solemn
and permanent character to establish those fundamental
maxims, and fix those unvarying rules by which all depart-
ments of the government must at all times shape their con-
duct; and if it descends to prescribing mere rules of order
in essential matters, it is lowering the dignity of such an
instrument, and usurping the proper province of ordinary
legislation.  *  *  *  If directions are given respecting the
times or modes of proceeding in which a power should be
exercised, there is at least a strong presumption that the
people designed it should be exercised in that time and
mode only; and we impute to the people a want of due
appreciation of the purpose and proper province of such an
instrument, when we infer that such directions are given
to any other end."  (Const. Lim. (3d Ed.), 78, 79.)  And
further on he states his full concurrence with the statement
of Mr. Justice Emmot in People v. Lawrence, 36 Barb., 186,
that "it will be found upon full consideration to be difficult
to treat any constitutional provision as merely directory and
not imperative."  (Id., 82.)  And with reference to the
frequent provision for the entering of the yeas and nays
upon the journal on the final passage of every bill, he says:
"Such a provision is designed to serve an important pur-
pose in compelling each member present to assume, as well

as to feel, his due share of responsibility in legislation; and also in furnishing definite and conclusive evidence whether the bill has been passed by the requisite majority or not." (Id., 140.) And again, as though intended to conclude the whole matter: "The fact is this: that whatever constitutional provision can be looked upon as directory merely is very likely to be treated by the Legislature as if it was devoid even of moral obligation, and to be therefore habitually disregarded. To say that a provision is directory seems, with many persons, to be equivalent to saying that it is not law at all. That this ought not to be so must be conceded; that it is so, we have abundant reason and good authority for saying. If, therefore, a constitutional provision is to be enforced at all, it must be treated as mandatory. And if the Legislature habitually disregard it, it seems to us that there is all the more urgent necessity that the courts should enforce it." (Id., 150.)

It is said in Sutherland on Statutory Construction that "in a large majority of the states in which the question has arisen, the courts have held constitutional provisions in reference to parliamentary procedure in legislation to be mandatory." (Suth. Stat. Const., Sec. 41.) In the able and exhaustive brief of counsel for the relator a large number of cases are cited and reviewed, showing that in twenty-seven states constitutional requirements have been held to be mandatory. In some of the cases the provision considered contained negative or prohibitive words, and in others the language of the provision was merely in the form of a positive mandate. We deem it unnecessary to review the authorities. Although there is to be found respectable authority to the contrary in respect especially to those provisions which do not contain negative or prohibitory words, it seems to be held generally by the preponderating weight of authority that constitutional requirements are mandatory, rather than merely directory. Counsel appearing *amicus curiae*, in support of the validity of the statute in question, has industriously collected the cases wherein certain pro-

visions relating to procedure in enacting and authenticating laws have been held to be directory merely. Some of them will be presently referred to. It is to be observed, also, that in a few states where the theory of mandatory construction is adopted the courts refuse to go behind the enrolled act to discover whether constitutional requirements have been observed in its passage. This is notably so in Montana as to ordinary legislation, though a different rule seems to have been adopted in respect to proposed constitutional amendments.

In Colorado the requirement that the presiding officer shall sign every bill in the presence of the house, and that the fact of signing shall be entered on the journal, was held to be directory. (In re Roberts, 5 Colo., 525.) And the same conclusion was reached in Missouri. (State ex rel. v. Mead, 71 Mo., 266.) The reason upon which those decisions were based was that the provision did not contain negative or prohibitive words, such as "No bill shall become a law unless," etc., which were found in connection with other provisions.

In Montana the silence of the journal as to signing, under a similar constitutional provision, was held insufficient to invalidate an act upon the ground that the journal was not competent to impeach the enrolled act.

In Nebraska a statute was upheld, although not signed by the President of the Senate. A journal entry of the fact of signing was not required. But the court held that the required signing was a mere authentication for the information of the executive. (Taylor v. Wilson, 9 Neb., 88; see also Cottrell v. State, 17 Neb., 125.) In later Nebraska cases constitutional requirements seem to have been regarded generally as mandatory. (Webster v. Hastings, 59 Neb., 563; State ex rel. v. B. & M. R. Co., 60 Neb., 741.) And in that state the rule is that the journals by an affirmative showing that an act was not constitutionally enacted are competent to impeach the enrolled act. (State ex rel. v. Frank, 61 Neb., 679.) In State v. B. & M. R. Co.,

*supra,* it was said: "If the entries found in the journals expressly and unequivocally contradict the evidence furnished by the enrolled bill, the former will prevail." And in Colorado a provision other than the one considered in the case of In re Roberts, *supra,* relating to the procedure required in the enactment of laws, was held to be mandatory. (In re House Bill 250, 57 Pac., 49.)

In Kansas the failure of the Lieutenant Governor, as presiding officer of the Senate, to sign an act as required by the constitution was held not to render the act invalid. It was argued in the opinion that if such a failure operated to invalidate an act it gave in effect to the presiding officer a greater veto power than was possessed by the Governor. (Com'rs v. Higginbotham, 17 Kan., 74.) No journal entry was required.

On the other hand, in Texas a provision similar to the one we are considering was held to be mandatory. (Hunt v. State, 22 Tex. App., 396.)

The larger number of cases dealing with this question seem to have arisen in reference either to a constitutional amendment, a provision for entering on the journal the yeas and nays on the final passage of a bill, or a provision that no bill shall be passed containing more than one subject, which shall be clearly stated in the title. And as to those matters the weight of authority seems to be that the provisions are mandatory.

The evident purpose of Section 28 and its requirements may be said to furnish some cogent reasons for holding it to be mandatory. It is obviously intended that the final act before the bill goes to the Governor shall be done publicly and not privately; and that the house shall be apprised of the fact that a certain measure receives the authenticating signature of its presiding officer. Hence should there be a valid objection, either because of mistakes or otherwise, an opportunity would be offered for its presentation. In a certain sense the act of signing is an act of the body itself, although the signature appended is that of the

officer, since the latter, in that matter, represents the body whose presiding officer he is, and no objection is interposed to his performance of the required act.   Under this provision the officer may not lawfully append his signature to the bill during a recess or adjournment of the body.   He may not do so after it has adjourned finally and its labors have terminated.   That he shall do so in the manner prescribed, it is provided that his act be noted on the journal, which contains a record of only those proceedings occurring while the body is in session.

A construction that the provision is merely directory, so far as interference by the courts is concerned, would permit the officer to sign any and all bills in his room out of the hearing and presence of the house, and even during recess or after final adjournment; and the safeguard intended by the provision might be entirely overthrown.   It is a matter of legislative history in this State that during a prolonged struggle in the attempt to elect a United States Senator, immediately after the close of a joint session for that purpose, the House of Representatives, upon motion of a member, evidently offered and adopted without reflection, was suddenly adjourned; and that at the time several enrolled acts were upon the Speaker's table awaiting his official signature.   His power to sign them had ceased, and he did not attempt to do so.   It is not necessary to enter upon a discussion of the possible result had the Speaker signed the bills after such adjournment, and had they been delivered to and approved by the Governor, should the constitutional requirement be held directory merely.   It may be urged, indeed, that as the acts had in reality passed the Legislature, no injury could have resulted to the people. But a provision solemnly constituted a part of the fundamental law would have been violated, and it is doubtful whether it could lead to other than disastrous consequences. We are not suggesting that any presiding officer would wilfully disobey a plain mandate of the constitution.   Our purpose merely is to refer to the possibility of such an occurrence.

Notwithstanding this discussion of the construction to be given to a constitutional provision, it is not intended to commit the court upon any proposition not essential to the determination of the question before us. And, unless the entries in the journal shall be found insufficient to amount to a compliance with the constitution in the respect complained of, it will not become necessary to decide whether the provisions of Section 28 are mandatory or otherwise. We have deemed it not improper to show the condition of the law as resting upon the adjudged cases, sufficiently at least to suggest that in all events the far safest course for the Legislature to pursue is to see to it that the requirements are in every particular obeyed.

For our present purpose, in continuing the consideration of the questions presented, it may be assumed, without deciding it, that Section 28 is a mandatory provision of the constitution.

As will be observed when we come to an examination of the journal, it is not altogether silent respecting the action of the Speaker in regard to signing the act in controversy; although it is but fair to say that counsel for the relator so construes the entry in dispute as to practically render it silent as to the signing of that particular act. We think, however, that it must be admitted that there was an attempt even as to that act to make an entry in regard to signing. The question, therefore, arises, what kind of an entry is necessary or sufficient to answer the requirements? Upon this point it is very properly conceded that the entry must amount to a *substantial* compliance with the constitutional provision, and counsel for relator argues that to constitute a substantial compliance the entry must of itself convey to the mind "the fact of signing;" and he says that if there appears such an entry, then from that record it may be presumed that the signing occurred in the presence of the House after the title of the act had been publicly read.

Legislative journals are usually prepared from "loose memoranda, made in the pressure of business, and amid the

distractions of a numerous assembly." They are not generally prepared by persons skilled in the technical construction of laws.

The constitution itself does not prescribe the language to be employed in noting upon the journal "the fact of signing." It is not reasonably to be expected, therefore, that every one who may be selected to keep the journal will make the entry in the same words, nor perhaps with the same particularity. In construing an entry of this character, it is incumbent upon the court to continue to indulge the general presumption of the regularity of the passage of the act assailed, and the authenticity of the signatures thereto attached. Upon an inspection of the enrolled act it is found that the Speaker of the House has signed it, and it is admitted that he did sign it. Indeed, the agreed statement of facts stipulates that it was "duly" signed; and counsel who presented this case *amicus curiae* lays some stress upon that stipulation. A strict interpretation of the admission possibly might bear out his contention that it covers compliance with the constitutional provision as to manner and time of signing. But we are not inclined in this very important matter to rest a conclusion upon an admission as to the performance of a constitutional requirement, when the proof thereof is to be found in a record of which the courts doubtless ought to take judicial notice, especially when the same is called to their attention, and, notwithstanding a possible admission, the latter is claimed to misrepresent the facts. But the Speaker did sign the enrolled act, and it was approved by the Governor, and deposited in the office designated by law. Hence the legal presumption follows until overthrown by competent evidence that it was signed as required by the constitution, and that the formalities required accompanied such signing.

With these observations we will proceed to consider the journal entry. At the outset let it be remarked that the House and Senate Journals show affirmatively that the act in controversy passed the respective bodies by a

constitutional majority, and no complaint is made that it was not passed in the form and manner prescribed by the constitution, and with the proper entries in the journals; until it came to be signed by the Speaker of the House.

The bill for the act was introduced in the Senate as Senate File 42. After its passage and enrollment it was known as Senate Enrolled Act No. 26. Bills introduced in the Senate are known as "Senate files" and those introduced in the House as "House bills," each file and bill being designated by a certain number. The usual custom observed in the journals of both houses was to refer to them by the use of initials, viz: S. F. for Senate file, and H. B. for House bill; and the enrolled acts were similarly designated, viz: "H. E. A." for House enrolled acts, and "S. E. A." for Senate enrolled acts.

The following entry appears in the House Journal, at page 474 of the printed copy, as a part of the proceedings of February 16, 1901, which was the last day of the session:

"SIGNING OF BILLS.

"The Honorable Speaker announced that he was about to sign the following H. E. A.s: H. E. A. No. 56, entitled House Bill No. 102, by C. E. Shaw, A bill for 'An act to amend and re-enact Sections 891 and 894 of the Revised Statutes, 1899, relating to Water Commissioners.'"

Then follow six other paragraphs, mentioning in each an "H. E. A." by number and title, as well as by number of original bill. And then appears the following without further explanation:

"S. E. A. No. 20, entitled S. F. No. 26, by Mr. Thomas.

"S. E. A. No. 25, entitled Senate File No. 45, by Mr. Sullivan.

"S. E. A. No. 16, entitled S. F. No. 15, by Mr. Thomas."

Then follow in the same manner reference to eight other Senate enrolled acts, and then appears the following:

"S. E. A. No. 26, entitled S. F. No. 42, by Mr. McGill, A bill for 'An act to amend and re-enact Sections 2178,

2180 and 2183 of the Revised Statutes of 1899, and to repeal Sections 2179, 2181, 2182, 2185 and 2186 of the Revised Statutes of 1899, relating to gaming.'"

The entry immediately preceding the heading, "Signing of Bills," is a report from the House Committee on Enrollment, showing the due enrollment of several House bills; and immediately following the entry as to Senate Enrolled Act No. 26 is an entry showing that, on motion of a member, the House resolved itself into a Committee of the Whole for the consideration of bills and resolutions on the general file. And the record of proceedings continues for several pages until final adjournment is recorded.

It thus appears that, at the time of the announcement of the Speaker recorded as above mentioned, the House was in session.

Two points are urged against the sufficiency of this entry—first, that a statement that the Speaker announced that he was "about to sign the following," etc., without more, is not a statement or entry of the "fact of signing;" and, second, that the announcement recorded is that he was about to sign the "following H. E. A.s," and that the entry fails to connect any announcement or act of the Speaker with the Senate enrolled acts which are referred to following the description of the House enrolled acts.

It must be confessed that the argument possesses considerable force, and that the question is a serious one and of no little difficulty. In the first place, let us inquire what intention is manifested by the entry? It is evident that the words commencing with the heading, "Signing of Bills," and ending with the mention and description of S. E. A. No. 26, are intended as one entry and upon one subject. This is apparent not only from the context, but from the entries immediately preceding and following it.

Throughout the journal the various entries are explained by headings indicating in a general way the subject or matter that is to follow. For example, whenever the House resolved itself into a Committee of the Whole, the

entry thereof is preceded by the heading, "Committee of the Whole." And so we find the following headings: "Privileged Reports," "Introduction, Reading and Reference of Bills," "Communication from the Senate," "Second Reading of Bills," "Bills on Final Passage," etc. And usually, it may be said, the various entries are separated and distinguished by characteristic captions. Immediately preceding the disputed entry appears two reports from the Committee on Enrollment, under the explanatory title, "Privileged Reports." Directly following the entry in question is the heading, "Committee of the Whole." Moreover, in various places in the journal, under the title, "Signing of Bills," House enrolled acts and Senate enrolled acts are included in the same announcement and the entry thereof. At page 472, under such a heading, it is recorded that "Mr. Speaker announced that he was about to sign:" and then follows the description by number and title of one S. E. A. and several House enrolled acts. It was not the custom, therefore, for the clerk to keep the record of the signing or the announcement of the Speaker that he was about to sign the bills originating in the House in entries separate from those originating in the Senate.

The Speaker may have announced that he was about to sign the following House enrolled acts, and then, as he signed them, read their title and number, and without any reiteration of his intention proceeded to announce or read Senate enrolled acts by number and title, after finishing signing those of the House, and if so, it cannot be doubted but that the House would have naturally understood that he was signing the Senate acts so mentioned.

And, in regard to this entry, while it is open to the technical objection that it does not, in so many words, state that the Speaker announced his intention of signing the said list of Senate enrolled acts, such is the natural and reasonable interpretation of the entry. And there is nothing elsewhere in the journal to disturb that interpretation. The list of acts is not associated in that place with any

other· procedure. No other entry records their signing or any announcement thereof in the House; and there is absolutely nothing upon which to found any misunderstanding of the record. And, moreover, the Senate Journal shows the signing of the same acts on the same day by the President of the Senate.

Therefore, we understand and construe the journal as showing, by the entry aforesaid, that the Speaker announced that he was about to sign, among other bills, Senate Enrolled Act No. 26. What then is the force and effect of the entry in respect to the constitutional requirement?

An examination of the House Journal discloses that, under the same title or heading, "Signing of Bills," the action taken was recorded in one of two ways: either that "the Speaker announced that he was about to sign" or that "the Speaker announced the signing" of certain described bills or enrolled acts, and the former expression is the one more frequently employed.

Now, it is argued with much force that the statement of the announcement that the Speaker is ·about to sign cannot convey to the mind the fact of signing; that such a statement mentions no more than an announced purpose or intention, which may or may not be carried out; and that the court is not permitted to indulge any presumption from such an announcement or the journal entry thereof. And it is argued also that the entry is not aided materially by the caption, "Signing of Bills."

In determining what will constitute a substantial compliance with the requirement, it is difficult, if not impossible, to draw a line of distinction between sufficient and insufficient entries. But the substance should not be sac-. rificed to the shadow. The journal entry required is not the substance. It is the evidence merely of compliance with the form which has been prescribed by the constitution. The material things which the constitution requires is that each bill shall be signed by the presiding officers, and that it shall be so signed in the presence of the re-

spective bodies over which they preside, and after its title shall have been publicly read. We have already adverted to the objects of this requirement. We know that the bill in question was signed. In the absence of the provision for a journal entry, the presumption would follow that the signing occurred in the required place and manner.

It is the manifest design of the requirement to prevent the surreptitious authentication of any measure as the act of the Legislature. This is accomplished by a public reference to the act to be authenticated, and the signing thereof in the presence of the body over which the officer presides. It is impossible to escape the conclusion that when the Speaker announced that he was about to sign a bill, referring to it by number and title, the House was then as fully informed, for all practical purposes, as it would have been by a statement that he was signing or had signed the bill. The act is thereby relieved of all privacy; all opportunity for fraud or deception in regard to the matter is gone; and the beneficent purpose of the substantial requirement is fulfilled. Hence we conceive that the courts should not apply a technical construction to an entry evidently intended as a compliance with the constitution. Again, we think it is not permissible for the court to eliminate all consideration of the fact that the Speaker's signature appears upon the enrolled act. We are convinced that the court should not discard such an essential and important item of evidence that will strongly appeal to the ordinary mind, when we come to interpret the effect of the journal entry. And we think this is so without disputing the proposition that the journal is the ultimate and conclusive evidence as to the fact of signing at the time and place required. But the entry itself is to be examined, and its force determined in the light of surrounding circumstances.

As to the mere fact of signing, we think the journal entry is neither the ultimate nor conclusive evidence. The signature attached to the document is the best and most satisfactory evidence of that fact. The journal entry is

for a different purpose. The object of the requirement for a journal entry of the fact of signing is clearly the perpetuation of record evidence of the highest character of the time and place when the signing occurred; thus showing that it occurred in compliance with the constitution. It might be conceded that, in the absence of the Speaker's signature to the enrolled act, the journal record of an announcement that he was "about to sign" would be insufficient to prove that it had been signed. And it might even be conceded that, upon a strict and technical reading, it would not necessarily imply that the announcement was followed by the act of signing. But the word "about" is a relative term. "It may indicate one thing when applied to one state of facts, and another under different circumstances." (Von Lingen v. Davidson, 4 Fed., 346.) In the case cited "about to sail," applied to a ship, was held to mean "about ready to sail;" and the meaning of the word was held dependent largely upon the understanding and expectation of the parties. And the court said: "Since 'about' may mean a longer or shorter period, according to circumstances, these circumstances tend to show what limitation the parties put upon it in this transaction." That was a case arising under contract, and the word had reference to length of time.

Various definitions are given the word. Generally it imports nearness in time, quantity, quality, number or degree. (Bouvier's Law Dict., Rawles Revision.) But it is also defined by the lexicographers as "concerned in; engaged in; as, what is he about?" (Century Dict.) "In concern with; engaged in; intent on." (Webster's International Dict.) If the sufficiency of the entry depends upon the significance of the word "about," the meaning must be determined by reference to the subject matter. Had the entry stated that the Speaker was about signing the bills, omitting the preposition "to," it would not be difficult to apply the above definitions, as indicating not only a purpose of the Speaker, but his present acts, viz:

that he was then engaged in signing the bills. Yet the same language might also indicate that he was merely ready to sign. Now, it may be admitted that to a casual reader there appears to be a slight difference between "about signing" and "about to sign;" and that the latter expression is more apt to convey the impression that the act, though immediately contemplated, has not been performed. But it certainly means, if no more, that the act is in immediate contemplation. In the connection where we find it, the expression signifies at least that the Speaker was *then*, that is to say, immediately, without delay, going to sign. The journals elsewhere disclose that the bills named were then ready for signature, having duly passed both bodies, and been duly and correctly enrolled.

Applied to the subject matter, and considering the caption of the entry, viz: "Signing of Bills," it occurs to us that it is not a strained construction to say that the record denotes that the Speaker was at that time engaged in the act of signing the several bills described in the entry. The caption may not of itself be sufficient to evidence the fact of signing, although it would seem to be persuasive of such fact. Nevertheless, it should not be altogether disregarded. In our opinion, it is to be considered as explanatory of the entry. It tends strongly to unfold the meaning of the words that follow, or the sense in which they were employed.

The case then presents this situation: It is admitted that the enrolled act bears the Speaker's signature; and it appears that with due formality the bill passed both houses by a constitutional majority. It duly reached the Governor and obtained his approval. The intent is evident to comply with the constitutional requirement of Section 28, Article 3, as to journal entry; and the entry made corresponds with the entries made in respect to a large majority of the acts of that Legislature, clearly indicating a knowledge of the requirement and a belief that it had been complied with. No form of entry is prescribed by the constitution, and

substantial compliance is all that is necessary. The object of the requirement as to entry of the fact of signing on the journal is not so much to furnish evidence of signing, as that the bill was signed at the time and place required. The plain purpose of the provision as to time and manner is the prevention of private or surreptitious action on the part of the presiding officer. In view of the well settled principle that the contrary must be made clearly to appear, before the presumption of regularity arising from an enrolled act appearing to have been properly signed and approved, can be overthrown, and the conditions under which legislative journals are usually prepared, they ought not to be construed technically, but they should be sustained as sufficient whenever it is possible to reasonably so construe them.

In view of the facts, and for the reasons aforesaid, we think that the journal entry in question must be held to amount to a substantial compliance with the constitution.

It is always a matter of very grave importance to decide upon the constitutionality of an act of the Legislature, and a statute should be held void only where it is shown that there has been a clear violation of the constitution. Where there is any doubt, it is to be resolved in favor of the law. We have shown that the intention manifested by the journal record in dispute is to show the fact of signing. To overthrow the entry we are urged to apply a technical interpretation to certain words, so as to render it something less than was intended. The spirit at least of the constitutional provision has been complied with, and we conceive it to be our duty to give every reasonable presumption to the record made by the Legislature.

It was said in a Kansas case: "If there is any room to doubt as to what the journals of the Legislature show, if they are merely silent or ambiguous, or if it is possible to explain them upon the hypothesis that the enrolled statute is correct and valid, then it is the duty of the courts to hold that the enrolled statute is valid." (State v. Francis, 26

Kan., 731; Chesney v. McClintock, 61 Kan., 94, 58 Pac., 993.)

The constitution of Alabama required the fact of signing to be entered on the journal of the House. A Senate message was sent to the House informing that body that certain bills had been signed by the President of the Senate, and requested thereto the signature of the Speaker of the House. Following the record of the message, under the caption, "Signing Bills," it was entered that the Speaker, in the presence of the House, immediately after their titles had been publicly read by the clerk, signed the bills whose titles are set out in the foregoing Senate message. Immediately following that entry was a report of the House Committee on Enrollment showing the correct enrollment of divers House bills. And directly following the report appeared the following: "Signing Bills. The Speaker of the House; in the presence of the House, and immediately after their titles had been publicly read by the clerk, signed the bills whose titles are set out in the foregoing message from the Senate." No mention whatever was made of the bills included in the report of the committee. But the court held that, as a previous entry had been made showing the signing of the bills in the Senate message, and, after the report of the committee, no message from the Senate was before the House, but the report of the Enrollment Committee preceded the disputed entry as to signing bills, the description of the bills signed as those mentioned in the Senate message was an evident clerical misprison, and that the journal entry should be read as if the words "report of the Committee on Enrolled Bills" had been used instead of the words "message from the Senate." And it was said that the journal corrected itself. (O'Hara v. State, 121 Ala., 28.) Now, it is evident that it might have been, and doubtless was, argued that the entry there in controversy was a mere repetition of the previous entry as to the Senate bills, and that there was an omission to state the fact of signing as to the bills included in the report of the committee. But the court

read the entry in the light of the surrounding circumstances and so as to carry out what was conceived to have been the intention of the clerk. And the conclusion of the court was stated to be that the journal affirmatively showed the fact of signing a bill in controversy which was one of those embraced in the report of the committee.

In Miesen v. Canfield, 64 Minn., 513, the court said that the courts will give to the entries in the journals the reasonable construction most favorable to the validity of the act, in recognition of the well settled rule that the evidence must be very strong to overcome the presumption that a bill, duly authenticated, was constitutionally passed.

For the reasons above set forth, it is not necessary to decide the reserved questions numbered one to four, inclusive. Upon the fifth question the decision of the court is that the journals of the Senate and House of Representatives of the Sixth State Legislature show that Senate File 42 was enacted in compliance with the requirements of Section 28 of Article 3 of the constitution.

Upon the sixth question the decision of the court is that Chapter 65 of the laws of 1901 is a valid and constitutionally enacted statute of Wyoming.

The seventh question is answered in the negative, for the reason that the sections of the Revised Statutes named in said question were repealed by said Chapter 65 of the laws of 1901.

CORN, C. J., and KNIGHT, J., concur.